Yes, I think so, because although technically not an issue here, underlying this lawsuit is of course that conflict with Rule 16. Right, if you prevail in the other case, then this case is moot. Correct, correct. Even if I did not prevail for some other reason in the first Vehemeyer case, I would say, look at the position Plaintiff was in. If he had filed this action in state court, he wouldn't have had this problem with the dual amendments. But he does have the problem with the defense court. Is there any prejudice to defendants? Absolutely not. It's like prejudice to Mr. Black, and if the brawl escapes me two years later. They're represented by the same counsel, the same facts are at issue. Obviously what I'm trying to do here in filing the second lawsuit is avoid a possible adverse ruling on bringing in these guys as defendants. And incidentally, the second Vehemeyer case was filed before Judge Carter made his ruling in the first one dismissing the Doe. And I was trying to cover my bases. Okay. I think we have the argument at hand on that. Why don't you save whatever time you have for rebuttal and we'll see. I will. I'm done. And I don't want to be redundant either, so I guess what I'd like to do is emphasize one point, and I'm not meaning to go over into the other case. However, with that caveat, I nonetheless feel compelled to say that in the initial disclosure, it's not just the names of these officers, at least as far as Officer Keyhouse is concerned. He's specifically identified as the dog handler. And did he, in your best judgment, let the dog loose? Give the order for the dog to attack? I mean, it just strikes me as terribly odd that we're sitting here at this point and there's a dispute. He's either Graham or Keyhouse, and according to the reports, as I understand them and were disclosed, it's Keyhouse who's the dog handler. Yes. We know that. But, I mean, sometimes another officer can order the dog loose. I don't mean that it's unusual, but are you saying Graham did not issue any orders? Is that what your position is? Our position is what Graham did is he ordered the other officers back. And that's all? And that's all. And I think that's the only fact or even inference that the record would suggest, is that Graham ordered the officers back and that Keyhouse is the dog handler. Okay. But the point I wanted to make is the second point, which is Keyhouse is identified as the dog handler. It's not a question of, oh, here's a report, and I'd have to go get it in order to figure that out. That's on the face of the disclosure. And I do think that that's a distinction that is of some relevance, and I wanted to share that with the Court because I don't think I emphasize that well enough. He's identified. The name of the dog is identified. The officer is identified. The arrestee is identified. And that's all on excerpts of record, page 244. There are a number of copies, unfortunately, of that one, so you get some duplication. But I know a real legible copy is 244, and I would invite the Court to look at that because it's stated there. Are you talking about the 26A disclosure? Correct. Correct. And other than that, unless the panel has further questions, I think I will be prepared to answer. Okay. Very good. Thank you. The case just heard will be submitted. We thank you all for your arguments. We'll proceed with the last case on the oral argument calendar, Slade v. Baca. It's always fun to be in the audience when one of your cases is discussed, right, Mr. Hager? It's always good to be in the audience when one of your cases is being discussed. It might be three of them, Cabrales, Santos, and Jones. Okay. Good morning, Judge Thomas, Judge Paez, and Judge Reed. Nice to see you all again. All I have to say right now is that with respect to the Betty Jones case, with respect to which Judge Reed asked a question during the prior argument since everybody is still here, I want to point out that that case provides for the possibility of res ipsa locator, especially in Judge Silverman's dissent and also in the amended majority opinion by Judges Scanlane and Brunetti. With that, I'm going to reserve all of my time for rebuttal, unless the panel has questions right now. We'll stand for rebuttal. May it please the Court. My name is Raymond Sakai, and I represent appellee Leroy Baca. This appeal presents two issues, whether there is a genuine issue of fact presented by appellee's declaration in opposition to a defendant, appellee's summary judgment, and whether the recent amendment to the California statute of limitations applies retroactively to revive an expired case. I'd first like to briefly address the first issue, and that is whether a genuine issue of fact was created by appellant's declaration. Appellant argues in his reply brief that a quote-unquote belief is enough to create a probable issue of fact in order to overcome the hurdle or overcome appellant's burden of production in the summary judgment, and it is appellee's position that it is not. I would first like to clarify a citation to our – to appellee's brief that appellant makes. It is a little bit on the misleading side. In the Bank-Mehli-Iran case, the point of law we were citing to wasn't the sufficiency of the plaintiff in that case's declaration. And in that case, the plaintiff was the sister of the Shah of Iran, and the issue there was whether her declaration was sufficient enough to state that she would not receive due process in Iran, and therefore, they couldn't enforce the judgment against her in Iran in this country. And in that case, the court said, well, we're going to look at the whole record. And it wasn't – and the record included country reports from the State Department, I believe, stating various facts of the current regime and facts about how the then – or the po-shah of Iran was not in favor. Instead, what appellee was citing that case for was what comes three paragraphs after – two or three paragraphs after, and that is when the court says that a declaration on information and belief isn't sufficient enough to carry the burden of production to overcome the summary judgment. I just – he didn't say on information and belief. I was released on – he said, I believe. I was released on the 24th. That is correct. And that's basically all his declaration says. Let me ask you a few questions about this declaration by Greg Siebert. Yes, Your Honor. Okay. And he attaches a couple of documents to his declaration. And I note in reading Mr. Sheriff – Deputy Sheriff Siebert's declaration here that he says that he signed the – I guess that's his signature on the jacket. Correct. That's the cover of the booking jacket. Right. Okay. Now, let me ask you – he doesn't go on to explain, though, the whole process for releasing somebody from county jail, which is not an – which we know from cases all over the place. That's not an easy process at times. Correct, Your Honor. So when he stamps this release, does that mean he's pushed out the door? Well, this isn't in the record, but no. What happens is he – their inmates are taken to the Inmate Reception Center, and they're being processed for release. What happens is they'll get a release order. This isn't a deputy. It's actually, I believe, a custody assistant or operation assistant. And they would actually administer – well, the administrative process of release. And they'd get an order, and they'd stamp it. And it says – well, as it says here on the booking jacket, released. And then they'd sign it. And then it's not as though – Is it executed right then, out the door? That is my belief, and I – Ah-ha. So it's your belief that he was released. It's your belief that he was released on the 17th. Well, there's a quality control check, though, from Mr. – Exactly. What I was trying to get at is that I basically – Whatever that means. I'm sorry. No, but it is – I think that points out the problem. If the record is devoid from counter-evidence on the other side, but is there judicially noticeable facts that we have that would indicate that release stamping on this booking jacket means that the defendant was released that day? Well, I believe it's – Oops. In his – I thought his declaration was quite – in preparing for – and looking through all the documents that were submitted here, and reading his declaration, it was very careful. He didn't say he was put out the door. Well, that goes back to what I was answering before, and I was answering from my knowledge of the release process, and that there isn't, as in this courtroom, when I'm out the door, I'm out the door. I mean, that's not what it is. They are actually released out of IRC, and they are released after they are in a stamped release and signed release. But – Out the door. He was released on the 17th. Was he – was the door open and he pushed out? Yes. On the 17th. And – Or walked out. Or walked out. Well, they want to push him out these days. They're overcrowded these days. They want to push him out, right? Yes. Did that happen on the 17th? From the records, from the booking jacket, and from the declaration, yes. Okay. Show me on this, other than the words released and stamped, What else tells me on this, cover the booking jacket, that he was locked out the door? Because you would agree that if he was still waiting for the administrative process to be completed, he would still be in custody, correct? That's correct, Your Honor. And he couldn't have gone down and filed a lawsuit, correct? He could have filed a lawsuit, but the statute wouldn't run, so. Exactly. And – So what tells me, looking at this, what tells me that he was escorted out the door? Well, I think when you look at Paragraph 4, it says, I process and release plaintiff. And under the – What does Paragraph 4 say? It says, On September 17, 2000, I process and release plaintiff, Melvin Lewis Clay, from the custody of the Los Angeles County Sheriff's Department. And under the plain language of – But you're not telling me that – you're telling me that released also has another meaning. That – if I may go back to my answer. This is not on the record, but it's on my information and knowledge of the process. That's okay. Just go ahead. But, you know, a release is a release. There's a recent Ninth Circuit case, I can't give you the name of it, where a fellow sues – I think it's the Los Angeles – It's the Barras case. Because he was ordered released, but they didn't turn him loose for like 39 hours. And that case indicates that there's a system that said, we release 600 people a day and we can't get around to this. And eventually, I think, his case fails. Do you know that case? It's the Barras case. I believe it's Barras v. County of Los Angeles. Does that reflect the practices of Los Angeles? No. That case is different because the last step in the release process, again, is when a custody assistant or the – in this case, it is the operations assistant – stamps the booking jacket release and signs the name off of that. And also, this isn't in the record either, but there's also a computer database that is scanned in and it indicates IRC-8, which is basically inmates out. And that's the last step. What was that? What was that? There's a computer database system that also tracks the inmates in the County of Los Angeles. In the Barras case, they're talking about the whole release process. You know, from the time an inmate comes back from court until the time he goes back – goes through IRC and he's ultimately released. And in that case, we're talking about from the time he's ordered release until the time he's actually released and the Ninth Circuit said, well, I believe – I can't remember off the top of my head, but like 39 hours is not unreasonable. This isn't – this isn't Barras. And when we're talking about when our Mr. Slade was released, we're going off of the last step of the release process. Now, is that whole release process described in this declaration? No, it isn't. Okay. And again, going off the plain language of this declaration, saying that he was – this is when he was released. When you say, I believe I was released on a certain date, would you say that could be a way that you express yourself? Some people kind of talk in that sort of term. What about that? Well, in this case, we're not dealing with a pro per litigant. We're dealing with a represented plaintiff by experience counsel. And the implication of – the plain language implication of the declaration is that – But the lawyer put down what his client said and made that the affidavit. So his client said, I believe. The lawyer didn't coach him. He said, you better not say I believe. You better lay it on the line, the dates you were released. But I – maybe I'm misunderstanding. So Your Honor is asking that maybe in this case, this was more of a slang or – A way of expressing yourself. Exactly. Don't some people talk in those terms? I believe they do. But I believe also that – I'm sorry. To my knowledge, people do. But in the case where you're represented by counsel and counsel knows the law and what is required by Federal Rules of Civil Procedure 56E, it's incumbent upon counsel to craft a declaration that would be sufficient to carry the burden. And through my research, although it's a recent 11th Circuit case which wasn't cited in the briefs, but the facts are almost on – they're very similar to this case. In that case, it's case B, Capio-Bianco, and that's – There's a sheet you can give to the clerk afterwards. So why don't you – Well, the facts in that case are it was a 1983 excessive force case, and defendants were police officers. They brought a – I think we can read the case because it's unfair now to – if you haven't noticed other counsel, your case to counsel, that comment. But we'll read it. And the only other thing I have to say about that is that the declaration in that case was basically the same, saying, I believe this happened. Yes. Okay. With the Court's permission, I'd like to move on to the retroactive application of the California statute of limitations provision. Appellee's position is that Landgraf, Landsgraf controls in this case, and Landsgraf does not change the presumption, actually embraces the presumption against retroactivity of a statute. The cases cited by Appellant in his opening brief are not on all – not on all fours on this issue. Plaintiff cites Appellant, cites Usher and Rivera. Those two cases deal with whether we're going to – or the Court is going to retroactively apply judicial decisions, not statutes. And it relies on a different test, and that's the Chevron Oil v. Hudson test set out by the Supreme Court. In Landgraf, we're dealing with the retroactive application of a statute. The first part of the Landgraf test is whether – is there an express – is there a plain language intent, whether or not this statute applied retroactively or not. In Landgraf – I don't want to break into your argument, but just one thing. If we were to decide that the affidavit of the – or the declaration of the plaintiff raises a genuine issue of material fact, would we have to reach the question of retroactivity of the California statute? No, you would not. All right. Go on, please. So the first part of the test is whether or not there is this clear legislative intent. And in Landgraf, there wasn't. And in this case, there is loads of legislative intent that we can look to. And in enacting the statute, there is the Senate bill, the legislative record, and there is also code of civil procedure section 340.10 and 335.1. The section 340.10 specifically says that we're going to apply this retroactively to victims of the 9-11 terrorist attack. It doesn't say anything else about retroactive application to any of the other claims that can – that may be revived. And I find that interesting because the statute – what the statute says is a prime example of the inequities. And then it just refers to September 11th. But when you look at, as in the Landgraf case, when it says, well, okay, we'll also look at the legislative intent. And the legislative intent is – Well, that's when the statute is silent. I mean, if the statute is made expressly retroactive, then that's the end of the analysis. What's your best argument that the statute itself was limited in its retroactive effect to those who were victims of terrorist attacks in 9-11? I believe that's in the legislative intent – in the legislative record where it says basically what it says in 340.10, that we're extending the statute of limitations and it's specifically going to apply retroactively to the victims of terrorism. But say that the Court feels it is ambiguous and we have to go to the second test that Landgraf requires. And that second test is whether or not this statute would be, if applied, would be – would have an impermissible retroactive effect. And there's a specific definition of that retroactive effect. In Landgraf it says impair the rights of parties, possess when acted increased parties' liability for past conduct and imposes a new duty on law. Appellant argues that – also grafted onto Landgraf – is this dichotomy between procedural and substantive changes in the law – or laws. And that if it's procedural, then we could apply it retroactively, and if it's substantive, we can't. And following this line of argument, Appellant argues that, well, we're going to have to apply California state law regarding retroactivity. But that is wrong. In the Two Rivers case, the Ninth Circuit said, well, Wilson v. Garcia says we're going to borrow the state's special limitations law and their tolling provisions. We're not going to borrow the state's retroactivity interpretation. And that's a question of federal law. And so since we're going to use federal law, we look at Chennault, another Ninth Circuit case, which says, well, we'll look at it. We'll look at the difference between procedural and substantive, but in a lot of cases, in some cases, procedural changes will have substantive effects. And that was a holding. And we will not revive plaintiff's claim.
judges: Thomas, Paez, Reed